

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-13-2004

# Afran v. Gov of NJ

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3791

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Afran v. Gov of NJ" (2004). *2004 Decisions.* Paper 232.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/232

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-3791

BRUCE I. AFRAN; CARL MAYER,
on behalf of themselves and all other registered
voters in the State of New Jersey,
                                                            Appellants

v.

JAMES McGREEVEY, GOVERNOR OF THE STATE OF NEW JERSEY;
STATE OF NEW JERSEY

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 04-cv-03912
(Honorable Garrett E. Brown, Jr.)

Argued October 7, 2004

Before:  SCIRICA, *Chief Judge*, McKEE and FISHER, *Circuit Judges*

(Filed:  October 13, 2004)

Bruce I. Afran, Esquire (Argued)
10 Braeburn Drive
Princeton, New Jersey 08540

Carl J. Mayer, Esquire (Argued)
58 Battle Road
Princeton, New Jersey 08540
        Attorneys for Class Appellants and Pro Se

Stefanie A. Brand, Esquire (Argued)
Office of Attorney General of New Jersey
Department of Law and Public Safety
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
         Attorney for Appellees

---

OPINION OF THE COURT

---

*PER CURIAM*.

This matter requires us to determine the effect under the New Jersey Constitution and statutes of Governor James McGreevey's August 12, 2004 announcement that he will resign effective November 15, 2004.

Plaintiffs ask us to order the State of New Jersey to hold a special gubernatorial election. Under the New Jersey Constitution, such an election is required if there is a "vacancy" in office. There is no vacancy here because the Governor has not yet resigned and because he continues to serve and occupy the office. Absent a vacancy, no special election is mandated. We will affirm the judgment of the District Court.

## I. Facts

James McGreevey was elected as Governor of the State of New Jersey on November 6, 2001, and was sworn in January 15, 2002. He was elected to a four-year term which expires January 17, 2006.

2

At an August 12, 2004 press conference, McGreevey publicly announced his intention to resign before the completion of his term. Citing "an adult consensual affair with another man" which he believed would render the office "vulnerable to rumors, false allegations, and threats of disclosure," McGreevey declared "the right course of action is to resign." For the ostensible purpose of facilitating "a responsible transition," McGreevey stated that the effective date of his resignation "will be November 15, 2004." McGreevey continues to discharge the powers and functions of the New Jersey governorship.

The Governor's stated intention to resign "effective" November 15, 2004 is significant. Had McGreevey "vacated" his office prior to September 3, 2004, the New Jersey Constitution would require that his successor be elected on November 2, 2004. On the other hand, if the office is "vacated" after September 3, 2004, the President of the New Jersey Senate would serve as acting governor until the next elected governor takes office in January 2006. The current President of the New Jersey Senate is Richard Codey, who, like McGreevey, is a member of the Democratic Party.

Plaintiffs Bruce Afran and Carl Mayer, purporting to represent a class of all registered New Jersey voters, brought this action in federal court on August 16, 2004, seeking a declaration that Governor McGreevey "vacated" his office under the New Jersey Constitution; that this "vacancy" requires election of a new governor on November 2, 2004, to serve the remainder of the term; and that McGreevey's continued occupation

3

of the Governor's office infringes plaintiffs' First, Fifth, and Fourteenth Amendment rights in violation of 42 U.S.C. § 1983. The District Court for the District of New Jersey denied plaintiffs' request for declaratory and injunctive relief under 28 U.S.C. § 2201 and dismissed their § 1983 action for failure to state a claim.[1] Because this case involves only questions of law, our review is plenary. *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 388-89 (3d Cir. 2000). We will affirm.

## II. Federal Jurisdiction

We have jurisdiction under 28 U.S.C. § 1291 over the District Court's final order denying Plaintiffs' motion for declaratory judgment and dismissing the case. The District Court properly exercised its federal jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Federal jurisdiction is proper where plaintiffs assert a non-frivolous federal claim. *Martin v. United Way of Erie County*, 829 F.2d 445, 447 (3d Cir. 1987) (citing *Bell v. Hood*, 327 U.S. 678, 682 (1946)). Only where the claim upon which federal jurisdiction hinges is "insubstantial on [its] face" is dismissal for want of jurisdiction required. *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 898-99 (3d Cir. 1987) (quoting *Hagans v. Lavine*, 415 U.S. 528, 542 n.10 (1974)). Moreover, dismissal for lack of jurisdiction is only appropriate where "the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not

---

[1] *Afran v. McGreevey*, __ F. Supp. 2d __, 2004 WL 2072535 (D.N.J. Sept. 15, 2004).

4

to involve a federal controversy.'" *Id.* at 899 (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)).

In this case, plaintiffs claim they were deprived of their constitutionally protected right to vote. Although we conclude that plaintiffs have failed to state a claim upon which relief may be granted under § 1983, this does not deprive a federal court of jurisdiction. *See Kulick*, 816 F.2d at 898; *Martin*, 829 F.2d at 447.[2] Because plaintiffs allege deprivation of a fundamental right protected by the Constitution, *see Reynolds v. Sims*, 377 U.S. 533, 554 (1964), federal jurisdiction is proper.

---

[2]The jurisdictional language of 28 U.S.C. § 1343 tracks the language of 28 U.S.C. § 1983, but each calls for a distinct analysis:

> Under either [§ 1331 or § 1343], a court has jurisdiction over the dispute so long as the plaintiff alleges that defendant's actions violate the requisite federal law: under § 1331, any federal law; under § 1343, only laws that relate to civil rights. Once the plaintiff has met this threshold pleading requirement, however, the truth of the facts alleged in the complaint is a question on the merits, as is the legal question whether the facts alleged establish a violation. Otherwise, the district court could turn an attack on the merits, against which the party has the procedural protections of a full trial including the right to a jury, into an attack on jurisdiction, which a court may resolve at any time.

*Kulick*, 816 F.2d 895, 897-98 (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 70-71 (1978) and *Bell*, 327 U.S. at 682); *see also Fraternal Order of Police Dep't of Corrs. Labor Comm. v. Williams*, 375 F.3d 1141, 1143-44 (D.C. Cir. 2004) (differentiating standard for dismissing § 1983 claim for lack of jurisdiction from that applied to motion to dismiss § 1983 claim for failure to state a claim); *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295-96 (6th Cir. 1991) (dismissing action under § 1983 for failure to state a claim despite holding that plaintiffs' assertion of a "colorable claim" under § 1983 was sufficient to give rise to federal jurisdiction).

5

### III. Abstention and Certification

Defendants urged the District Court to abstain from asserting federal jurisdiction in light of the allegedly unsettled status of New Jersey law, a position plaintiffs– after opposing it in the District Court– now advance in the alternative to this court. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). The District Court declined to abstain. Although we rely upon different reasoning, we agree that abstention is inappropriate in this case.

The *Pullman* doctrine authorizes federal court abstention when a constitutional challenge is intertwined with an ambiguous issue of state law and a likelihood exists, therefore, that clarification of the state law issue will substantially affect the constitutional inquiry. *Id.* In order to abstain under *Pullman*, there must be three "special circumstances:"

> (1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;
> (2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of the adjudication of the constitutional claims;
> (3) A federal court's erroneous construction of state law would be disruptive of important state policies.

*Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991) (citing *D'Iorio v. County of Del.*, 592 F.2d 681, 686 (3d Cir. 1978)) *cert. denied*, 503 U.S. 907 (1992). If the court finds these three circumstances, "it must then make a discretionary

6

determination as to whether abstention is in fact appropriate under the circumstances of the particular case, based on the weight of these criteria and other relevant factors." *Id.*

Abstention under *Pullman* therefore is discretionary and is generally exercised sparingly. *City of Houston v. Hill*, 482 U.S. 451, 467 (1987) (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)); *see also Baggett v. Bullitt*, 377 U.S. 360, 375 (1964) ("The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers."); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 149 (3d Cir. 1999) ("*Pullman* abstention should be rarely invoked").

Moreover, ambiguity in state law will not, standing alone, require abstention. As the Supreme Court stated:

> [*Pullman* abstention] contemplates that deference to state court adjudication only be made where the issue of state law is uncertain. If the state statute in question, although never interpreted by a state tribunal, is not fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question, it is the duty of the federal court to exercise its properly invoked jurisdiction. Thus, "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law."

*Harman v. Forssenius*, 380 U.S. 528, 535 (1965) (quoting *England v. La. State Bd. Med. Exam'rs*, 375 U.S. 411, 415-16 (1964)) (citations omitted).

Principles of comity and federalism counsel for a state constitutional interpretation by state courts. But the state law which controls our decision is not uncertain.

7

Furthermore, the discretionary analysis in this case must be informed by considerations of timing, as well as the policy disfavoring forum-shopping. Were we to abstain, a final judicial determination would be substantially delayed. In a time-sensitive environment such as that presented by a rapidly approaching election, prejudice to both parties would inevitably result from such delay. *See Farmer*, 220 F.3d at 151 (noting that delay is a relevant factor in considering whether to abstain).

Moreover, citing an "immense conflict of interest" in an adjudication by the New Jersey courts, plaintiffs elected to bring suit in federal court. But having obtained an adverse ruling on the merits, plaintiffs now– in a reversal of position– argue to this court that the New Jersey state courts are better suited to resolving this dispute. We disagree and hold that *Pullman* abstention is inappropriate in this case.

Plaintiffs contend in the alternative that we should certify to the New Jersey Supreme Court the question whether Governor McGreevey's action effects a vacancy under the New Jersey Constitution. Under New Jersey Court Rule 2:12A, the New Jersey Supreme Court may answer such a question if "there is no controlling appellate decision, constitutional provision or statute in this State." Pressler, *Current N.J. Court Rules*, R.2:12A (Gann 2004).

The use of certification "rests in the sound discretion of the federal courts." *Lehman Bros. v. Schein,* 416 U.S. 386, 391 (1974) (Rehnquist, J., concurring). Moreover, this court "may not properly ask a state court if it would care in effect to rewrite a

statute," or a constitutional provision. *Farmer*, 220 F.3d at 152 n.12 (quoting *Hill,* 482 U.S. at 471). Relying upon the same considerations which inform our decision not to abstain– timing, feasibility, public policy, and plaintiffs' choice of forum– we decline to employ certification in this case.

## IV. The Constitutional Claim

Plaintiffs allege they have been deprived of their right to vote under the First, Fifth, and Fourteenth Amendments in violation of 42 U.S.C. § 1983. The District Court dismissed this claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

To state a claim for violation of § 1983, plaintiffs must allege that defendants, while acting under color of state law, deprived them of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) *overruled on other grounds, Daniel v. Williams*, 474 U.S. 327 (1986); *see also Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). This court's initial inquiry, therefore, is whether plaintiffs have "alleged the deprivation of a right that either federal law or the Constitution protects." *Gruenke*, 225 F.3d at 298 (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

The Constitution protects the right of qualified citizens to vote in both national and local elections. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted.") (citing *Ex parte Yarbrough*, 110 U.S. 651 (1884) and *United*

9

*States v. Mosley*, 238 U.S. 383 (1915)); *see also Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (noting that voting is a "fundamental political right"). Despite constitutional protection of the franchise, however, not every imperfection in state and local elections rises to the level of a constitutional violation. *Duncan v. Poythress*, 657 F.2d 691, 699 (5th Cir. 1981); *see also Forenza v. Rodgers*, 633 A.2d 1057, 1059 (N.J. Super. Ct. Law Div. 1992) (finding the proposition that "not every violation of state election law constitutes a denial of constitutionally guaranteed rights" to be "well established").[3]

But there are exceptions to the general rule that federal courts do not superintend the administration of local electoral contests. Where a discrete group of voters suffers a denial of equal protection, for example, their constitutional rights are violated. *See Reynolds*, 377 U.S. at 559-61. Of relevance to this case, a claim under § 1983 will also lie where state or local election infractions work a denial of substantive due process rights in violation of the Fourteenth Amendment. *See, e.g., Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001) ("[I]n those few cases in which organic failures in a state or local election process threaten to work patent and fundamental unfairness, a colorable claim lies for a violation of substantive due process"); *Duncan*, 657 F.2d at 700 (holding

---

[3]For this reason, federal courts do not generally meddle in local elections. *See Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980) (holding that Section 1983 does "not authorize federal courts to be state election monitors"). Indeed, election law disputes generally lie within the province of the state courts. *See Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970) (noting that jurisdiction over local election disputes, "with certain narrow and well defined exceptions," remains "in the exclusive cognizance of the state courts").

that "the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process"); *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978) ("If the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order."); *see also Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (enjoining winning state senate candidate from exercising official authority where absentee ballots were obtained and cast illegally).

We find instructive the decision of the Court of Appeals for the First Circuit in *Bonas v. Town of North Smithfield*, 265 F.3d 69 (1st Cir. 2001). In *Bonas*, four registered voters in the town of North Smithfield sought to compel an election in November 2001 for the North Smithfield town council and school committee. Because a referendum to transition the town from an odd-year election cycle to an even-year cycle had been adopted in 1998, and regularly scheduled elections had been held in 1999, the town decided not to hold a municipal election in 2001. Invoking § 1983, plaintiffs– who desired to exercise their right to vote for town council and school committee in 2001– filed suit in federal district court claiming denial of their constitutional rights.

The court recognized the limited reach of federal jurisdiction over claims arising from state or local election disputes but held that where the election process is patently and fundamentally unfair, substantive due process violations can occur. *Id.* at 74. "[T]otal and complete disenfranchisement of the electorate as a whole," held the *Bonas*

11

court, is one such instance of patent and fundamental unfairness giving rise to a constitutional claim. *Id.* at 75.

To determine whether such disenfranchisement had in fact occurred, the court turned to state law:

> Do state and local rules mandate an election in North Smithfield for the offices of town council and school committee in the fall of 2001? Assuming that such an election is required...the Town's refusal to hold it would work a total and complete disenfranchisement of the electorate, and therefore would constitute a violation of due process (in addition to being a violation of state law).

*Id.*; s*ee also Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295-96 (6th Cir. 1991) (same). We employ a similar analytic framework. Assuming New Jersey law requires an election in this case, refusal to hold it would rise to the level of a constitutional violation.

The determinative inquiry, therefore, is whether New Jersey law requires an election under these circumstances. As we discuss, we answer that question in the negative. Therefore, there is no violation of plaintiffs' substantive due process rights, and they have failed to state a claim under § 1983.

**V. New Jersey Law**

As a threshold matter, the parties vigorously dispute the method of interpretation to be employed in this case. Defendants urge this court to rely upon the plain meaning of the New Jersey Constitution, while plaintiffs suggest an expansive interpretation.

Plaintiffs rely heavily upon a "liberal" rule of construction they attribute to the New Jersey Supreme Court's opinion in *New Jersey Democratic Party, Inc. v. Samson*, 175 N.J. 178 (2002). In *Samson*, Senator Robert Torricelli withdrew his candidacy for United States Senator approximately five weeks before the November 2002 general election. The New Jersey Democratic Party requested Torricelli's name be taken off the ballot and replaced with the name of a new candidate. The applicable New Jersey statute set forth the procedures for replacement only when the vacancy on the ballot occurred "not later than the 51st day before the general election." N.J. Stat. Ann. 19:13-20. Regarding vacancies arising within fifty days of the election, however, the *Samson* court found the statute silent regarding replacement. Reasoning that reconfiguration of the ballots was logistically feasible, and emphasizing its belief that the applicable statute did not specifically preclude such a remedy, the New Jersey Supreme Court permitted plaintiffs to insert a new candidate on the ballot.

Significantly, the *Samson* court construed a New Jersey statute, rather than a New Jersey constitutional provision. We decline to apply the "liberal" interpretation urged by plaintiffs to the state Constitution where there is no indication that the New Jersey Supreme Court would itself espouse such an approach. Plaintiffs conceded at oral argument that the New Jersey Supreme Court has never expressly endorsed a "liberal" approach to interpretation of the state Constitution.

Of even greater significance, the New Jersey Constitution–in Article V, section 1, paragraphs 6 through 9–addresses each scenario generated by a gubernatorial vacancy and provides means for filling it. Where the language of a constitutional provision is clear, the words must be given their plain meaning. *Cambria v. Soaries*, 776 A.2d 754, 758 (N.J. 2001) (quoting *State v. Trump Hotels & Casino Resorts, Inc.*, 734 A.2d 1160 (N.J. 1999)). We are mindful of New Jersey's policy preference in favor of empowering voters, but we believe the language of the Constitution incorporates this principle within its text. Because the Constitution anticipates and provides for succession and election procedures following a vacancy in the office of the Governor, our textual analysis is already infused by New Jersey's preference for electing officials. Our analysis must begin with the text itself.

The New Jersey Constitution identifies several ways in which a gubernatorial "vacancy" may arise, among them resignation. N.J. Const. Art. V, § 1, ¶¶ 6-8. Plaintiffs argue that by virtue of Governor McGreevey's August 12th announcement, there is a vacancy in the office of Governor. Because we find this announcement alone does not constitute a resignation, we disagree.

The New Jersey Constitution establishes a comprehensive framework by which unexpected transfers of power in the office of the Governor will take place. When a governor resigns, a vacancy arises and the Constitution provides for a provisional fulfillment of the governor's duties by the President of the Senate:

14

> In the event of a vacancy in the office of Governor resulting from the death, resignation or removal of a Governor in office, or the death of a Governor-elect, or from any other cause, the functions, powers, duties and emoluments of the office shall devolve upon the President of the Senate, for the time being, and in the event of his death, resignation or removal, then upon the Speaker of the General Assembly . . . .

N.J. Const. Art. V, § 1, ¶ 6 ("Paragraph 6").

In addition to providing for the immediate assumption of power by the Senate President, the Constitution also provides that a vacancy in the office of the Governor will– in some circumstances– trigger a special gubernatorial election:

> In the event of a vacancy in the office of Governor, a Governor shall be elected to fill the unexpired term at the general election next succeeding the vacancy, unless the vacancy shall occur within sixty days immediately preceding a general election, in which case he shall be elected at the second succeeding general election; but no election to fill an unexpired term shall be held in any year in which a Governor is to be elected for a full term. A Governor elected for an unexpired term shall assume his office immediately upon his election.

N.J. Const. Art. V, § 1, ¶ 9 ("Paragraph 9").[4]

Reading these two provisions together, it is apparent that the New Jersey Constitution contemplates the resignation of the governor and subsequent transfer of power as a three-step process: first, the creation of a vacancy by the governor's resignation; second, the assumption of the powers and duties of the Governor's office by the Senate President; and third, an election to determine the next governor. The timing of

---

[4]In Title 19 of the New Jersey Code, which sets forth New Jersey election law, "general election" is defined as "the annual election to be held on the first Tuesday after the first Monday in November." N. J. Stat. Ann. § 19:1-1.

15

the first step– that is, when the Governor's office becomes vacant– determines both the date of the next gubernatorial election[5] and the duration of the Senate President's term as acting governor.  Unsurprisingly, it is this date of "vacancy" which lies at the center of the current dispute.  The parties offer competing views.

According to plaintiffs, a vacancy arose in the office of Governor on August 12, 2004, because McGreevey's public announcement constituted an effective resignation.  Because this announcement came more than sixty days before the next general election, they argue Paragraph 9 requires that an election to fill the remainder of McGreevey's term be held on November 2, 2004, or– as they stated at oral argument– on a judicially-determined date in the future.  Defendants, conversely, contend that no vacancy exists because no resignation has occurred.

---

[5]Should a vacancy occur within the sixty days preceding a general election, a new governor will be elected at the "second succeeding" general election.  For example, if a vacancy occurred in October– within the sixty day window immediately preceding a November general election– a new governor would be elected thirteen months later, at the next general election.  Second, where a vacancy occurs between 61 and 364 days before a general election, a new governor will be elected at that next general election to fill the remainder of the resigning governor's term.  For example, were a vacancy to arise in May, an election would be held the following November and the victor would assume the governor's office until the next regularly scheduled gubernatorial election– which could be up to three years later.  And finally, should a vacancy arise during the year of a regularly scheduled gubernatorial election, a successor would be chosen at that election.  If a vacancy arises in February of the final year of a governor's term, for example, a new governor would be elected for a full term the following November.

We agree with defendants on this point. Under the New Jersey Constitution, a vacancy will arise upon resignation.[6] Because Governor McGreevey has not resigned, there is no vacancy.

On August 12, 2004, Governor McGreevey made a declaration that he would resign from office and that such resignation "will be effective" November 15, 2004. Under New Jersey law, he has not taken the steps necessary to translate this announcement into an official act.

Chapter 14 of New Jersey Code Title 52 sets forth "[m]ethods of resigning from office" for both elected and appointed officers:

> Whenever a state officer holding an office under the appointment of the joint meeting of the legislature shall be desirous of resigning, he shall present such resignation in writing under his hand, during the sitting of the legislature addressed to the joint meeting. *All other state officers* desirous of resigning shall send their resignations, in writing, to the governor. All such resignations shall be filed in the office of the secretary of state. *No resignation made in any other way or pretended to be made, shall be valid.*

N.J. Stat. Ann. 52:14-10 (emphasis added).

The text of section 14-10 requires that a governor file a written resignation with the Secretary of State to effectuate his resignation. After specifying the resignation procedures to be followed by "a state officer holding an office under the appointment of

---

[6]The New Jersey Constitution provides that a vacancy in the Governor's office can arise by virtue of death, removal, resignation, failure to qualify, absence from the state, impeachment, or inability to discharge the duties of office by reason of mental or physical disability. N.J. Const. Art. V, § 1, ¶¶ 6-7.

17

the joint meeting of the legislature," the statute uses all-inclusive language requiring that "[a]ll other state officers" file written resignations with the office of the Secretary of State. N.J. Stat. Ann. 52:14-10.[7] Even though the requirement that resignations first be sent "to the governor" may be redundant when it is the governor resigning, this does not defeat application of section 14-10 to gubernatorial resignations. The governor falls within the catch-all category of "all other state officers" and his resignation must, therefore, comply with the terms of the statute. *See id.* ( "No resignation made in any other way or pretended to be made, shall be valid.").

The submission of a written letter of resignation to the Secretary of State by a departing governor, in accordance with section 14-10, is an established practice in New Jersey. Each of the four New Jersey governors to have resigned in the last 106 years have submitted a written resignation to the Secretary of State. In 1898, Governor John W. Griggs submitted a written letter of resignation to Secretary of State George Wurts. In 1913, Governor Woodrow Wilson submitted a hand-written resignation to the Secretary of State so that he could assume the presidency of the United States. In 1919, Governor Edge submitted a written letter of resignation to Secretary of State Thomas Martin. More recently, in 2001 Governor Christine Todd Whitman tendered a written resignation to Secretary of State DeForest Soaries.

---

[7]Elsewhere in the New Jersey Code, the governor is specifically included within the statutory definition of a "person holding an office in this State." N.J. Stat. Ann. 52:14-7(a).

Plaintiffs urge that McGreevey's public announcement is more "final" than would be a letter to the Secretary of State under section 14-10. They posit that "[e]ven if [McGreevey] theoretically retains the power to stay on and change his decision...the reality is that he is not changing his mind and he is going." The legal reality, however, is something different. Under New Jersey law, a resignation is not valid unless it is in writing and filed in the office of the Secretary of State. "No resignation made in any other way or pretended to be made, shall be valid." N.J. Stat. Ann. 52:14-10. Plaintiffs have cited no statutory provision to the contrary, relying instead on the argument that McGreevey's public announcement is "functionally far more definitive and final than would be a letter of resignation quietly and privately delivered to a government official." But the New Jersey legislature has set forth what constitutes a "definitive and final" resignation. McGreevey's announcement has not satisfied these statutory requirements.

By requiring a written filing with the Secretary of State– a clear and concrete manifestation of resignation– the legislature has assured clarity in the resignation process. Because Governor McGreevey has not yet officially resigned from the office of the Governor, there is no vacancy under the New Jersey Constitution.

## VI. Conclusion

In sum, we hold that there is no vacancy in the office of New Jersey Governor because James McGreevey, the current governor, has not officially resigned from office. Because it is the existence of a vacancy which triggers Paragraph 9's election procedures,

19

no special election is called for by New Jersey law.  Absent a state law requirement that such an election be held, plaintiffs have failed to state a claim under § 1983 for violation of their Fourteenth Amendment rights to substantive due process.

For the reasons stated, we will affirm.